UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

Nos. 99-1433(L)
(CA-97-982-1)

Donna S. Carter,

Plaintiff - Appellee,

versus

Ronald Nathan Barker, etc.,

Defendant - Appellant.

O R D E R

The court amends its opinion filed July 21, 2000, as follows:

On page 9, first paragraph, line 11 -- the year in "January 2, 1995" is corrected to read "January 2, 1996."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

DONNA S. CARTER,
Plaintiff-Appellee,

v.

RONALD NATHAN BARKER,
individually and in his official
capacity as Sheriff of Forsyth
County,
Defendant-Appellant,                                          No. 99-1433

and

ROBERT JAMES BLAKELY, individually
and in his official capacity as an
officer of Forsyth County Sheriff's
Department; FORSYTH COUNTY;
HARTFORD FIRE INSURANCE COMPANY,
Defendants.

DONNA S. CARTER,
Plaintiff-Appellant,

v.

RONALD NATHAN BARKER,
                                                             No. 99-1438
individually and in his official
capacity as Sheriff of Forsyth
County; HARTFORD FIRE INSURANCE
COMPANY,
Defendants-Appellees,

and

ROBERT JAMES BLAKELY, individually
and in his official capacity as an

officer of Forsyth County Sheriff's
Department; FORSYTH COUNTY,
Defendants.

DONNA S. CARTER,
Plaintiff-Appellant,

v.

FORSYTH COUNTY,
Defendant-Appellee,

and

ROBERT JAMES BLAKELY, individually

and in his official capacity as an
officer of Forsyth County Sheriff's
Department; RONALD NATHAN
BARKER, individually and in his
official capacity as Sheriff of
FORSYTH COUNTY; HARTFORD FIRE
INSURANCE COMPANY,
Defendants.

No. 99-1439

2

DONNA S. CARTER,
Plaintiff-Appellee,

v.

ROBERT JAMES BLAKELY, individually
and in his official capacity as an
officer of Forsyth County Sheriff's
Department,
Defendant-Appellant,

No. 99-2382

and

RONALD NATHAN BARKER,
individually and in his official
capacity as Sheriff of Forsyth
County; FORSYTH COUNTY; HARTFORD
FIRE INSURANCE COMPANY,
Defendants.

Appeals from the United States District Court
for the Middle District of North Carolina, at Durham.
William L. Osteen, District Judge.
(CA-97-982-1)

Argued: May 3, 2000

Decided: July 21, 2000

Before MURNAGHAN, LUTTIG, and MICHAEL, Circuit Judges.

_____

Affirmed and remanded by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Jack Michael Strauch, WOMBLE, CARLYLE, SAN-
DRIDGE & RICE, Winston-Salem, North Carolina; Urs Roland

3

Gsteiger, WILSON & ISEMAN, Winston-Salem, North Carolina, for Appellants. Robert Mauldin Elliott, J. Griffin Morgan, ELLIOT, PICHKO, GELBIN & MORGAN, P.A., Winston-Salem, North Carolina, for Appellees. **ON BRIEF:** Allan R. Gitter, WOMBLE, CARLYLE, SANDRIDGE & RICE, Winston-Salem, North Carolina; G. Gray Wilson, Tamura D. Coffey, WILSON & ISEMAN, Winston-Salem, North Carolina, for Appellants. Karen M. Torre, ELLIOT, PICHKO, GELBIN & MORGAN, P.A., Winston-Salem, North Carolina, for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Donna S. Carter sued Chief Deputy Robert James Blakely, Sheriff Ronald Nathan Barker, Forsyth County (North Carolina), and Hartford Fire Insurance Company on various federal and state law claims arising out of Blakely's alleged sexual harassment of Carter. The jury returned a verdict for Carter against Chief Deputy Blakely. Claims against the other defendants did not reach the jury. An appeal and cross-appeal have ensued. We now affirm the district court's decisions (1) denying Eleventh Amendment immunity to Barker on all official capacity claims, (2) denying Barker's motion for summary judgment based on qualified immunity on Carter's individual capacity § 1983 claim, (3) denying Blakely's motion for new trial on the issue of proximate cause, (4) denying Blakely's Rule 50 motion to strike the testimony of Carter's doctor, (5) sustaining the jury's award of compensatory damages against Blakely, (6) sustaining the jury's award of punitive damages against Blakely, (7) admitting or excluding certain challenged pieces of evidence, and (8) dismissing Carter's Title VII claims against Barker and Forsyth County. The overall result is that we affirm the judgment entered in favor of Carter against Chief Deputy Blakely, and we remand for a trial on Carter's § 1983

4

and state law claims against Sheriff Barker in his official capacity and on her § 1983 claim against the Sheriff in his individual capacity.

I.

A.

Donna Carter was hired by the Forsyth County Sheriff's Department ("Sheriff's Department") as an administrative deputy in September 1991. Chief Deputy Robert Blakely was Carter's immediate supervisor and the second in command at the Sheriff's Department. Carter worked outside Blakely's office. According to Carter, Blakely repeatedly sexually harassed and assaulted her from the end of 1991 to August 1995. Initially, Blakely's relationship with Carter was professional and appropriate, but towards the end of 1991 he began making disturbing comments regarding her appearance. Blakely talked of wanting to have an affair, saying that someday he would talk Carter into letting him make love to her. Blakely tried to persuade Carter to come to his house many times when his wife was out of town and also told Carter that she could lay naked in his wife's tanning bed.

Blakely began physically assaulting Carter in 1992. On several occasions from 1992 until August 1995, Blakely inappropriately touched and sexually groped Carter. The first instance occurred when Blakely called Carter into his office and ran his hand up her dress and leg. On another occasion, Blakely called Carter into his office, touched her breasts, and attempted to touch her private areas. Blakely would try to get Carter to place her hand on his crotch. While in a car together on errands, Blakely tried to put his hand on Carter's crotch. On another occasion, Blakely called Carter into his office and ran his hand all the way up her skirt and touched her menstrual pad. On still another occasion, Blakely took Carter into the Sheriff's office, closed the door, tried to lean her over the Sheriff's desk, and remarked that he wanted to make love to her. Because of Blakely's conduct, Carter transferred to the Narcotics Unit in July 1994. Nevertheless, Blakely persisted. After attending meetings in the narcotics building, he would go to Carter's work station and try to kiss her. Carter consistently resisted Blakely. She tried to push him away. She also told him to stop and said that his conduct bothered her and made her feel uncom-

5

fortable. Sometimes Blakely would apologize and promise that he would stop assaulting her. Carter wanted to believe him.

In early August 1995 Blakely sexually assaulted Carter yet again. After asking Carter into his dark office, Blakely put his hand directly into Carter's brassiere, and he tried to feel Carter's crotch. Blakely, who had an erection, took Carter's hands and placed them on his crotch. Carter tried to back away and placed her hands in front of her face as Blakely tried to kiss her. After Carter managed to turn the light on, she stood with her back to Blakely who refused to let her leave the room until he had "compose[d] himself." This was the last incident of sexual assault.

Carter suffered emotional distress as a result of Blakely's conduct. She testified that she became sick to her stomach after Blakely's sexual assaults. Carter also testified that the harassment and sexual assaults made her feel dirty, filthy, and ashamed. Carter questioned herself, wondering what it was about her that caused Blakely to "do those things to [her]." In the fall of 1995 Carter began seeing Dr. Rebecca Valla, a board certified psychiatrist. At that time Carter felt stressed and betrayed. She was having difficulty sleeping and eating, and she was losing weight. Carter testified that she felt this way because the harassment "was something that -- I just needed closure to. I needed it handled and an investigation, and the truth, and be known, and closure. I needed that." Carter left work on disability in 1997. At that time she was having nightmares, heart palpitations, and needed to see Dr. Valla every week.

Others also testified about Carter's emotional state. James Southard, a friend and confidant of Carter's, testified that Carter was in extreme fear of losing her job if she mentioned Blakely's behavior to Sheriff Barker. When Carter called Southard after Blakely's August 1995 sexual assault, she became so upset that she could not talk on the phone. Southard and Carter then met at a restaurant, and Carter cried as she disclosed the details of Blakely's conduct. Southard also noticed that Carter's personality changed over time as she became less outgoing and more reclusive. Carter's sister, Barbara Jones, testified that Carter cried and was extremely upset when Carter described the August 1995 sexual assault to her over the telephone. Steven Porter, Carter's former supervisor in the Narcotics Unit, testified that

6

Carter was extremely upset (crying and shaking) and distraught in a meeting in which she revealed Blakely's behavior to Porter. Porter said that in the fall of 1995 Carter appeared to be losing weight, and he observed that she began smoking and taking medicine. Carter's husband, Danny Carter, was also employed by the Sheriff's Department. He testified that in January 1996 Carter was hysterical about a confrontational meeting involving her and Blakely. He also testified that from May 1996 through June 1997 his wife became depressed and cried a great deal. Danny Carter attributed his wife's behavior to Sheriff Barker's failure to respond adequately to her allegations of sexual harassment.

Dr. Valla, Carter's psychiatrist, also testified about Carter's emotional distress and its cause. Dr. Valla testified that Carter began treatment for emotional problems in October 1995. According to Dr. Valla, Carter began seeing her in order to deal more effectively with chronic jaw pain that resulted from car accidents in 1978 and 1993. At that time Carter was taking five or six Vicodin pills daily.

Dr. Valla also testified that Carter was under extreme stress because of Blakely's sexual harassment and that the sexual harassment was increasing Carter's pain. Carter was having"dreams related to the sexual molestation she experienced," which were a symptom of Dr. Valla's diagnosis of post-traumatic stress disorder (PTSD). Throughout her visits Carter complained of pain, decreased appetite, and nausea. During direct examination Dr. Valla testified that Blakely's sexual harassment caused Carter to suffer extreme emotional distress. According to Dr. Valla, "the sexual molestation was very difficult for [Carter] during the time that it occurred. It was very distressing to her, and I believe that for the reasons of shame, and guilt, and so forth, that it contributed to her level of stress."

On cross-examination Dr. Valla admitted that the original source of Carter's PTSD was her abusive father. Dr. Valla also admitted that throughout the treatment Carter had discussed at least 36 stressors in addition to the sexual harassment. These stressors included a 1978 automobile accident that Carter claimed haunted her and ruined her life, jaw surgery, eventual joint replacement in 1989, another car accident in 1993, and Carter's dependency on medications. Many of these stressors aggravated Carter's chronic jaw pain. Dr. Valla admitted

7

that she was unable to discern to what extent any of the stressors, including the sexual harassment, contributed to Carter's pain and emotional distress.

On re-direct Valla testified that many of Carter's 36 stressors were normal and that she was treating Carter for ongoing stress. While the major cause of this stress was the 1978 car accident, Dr. Valla testified that the sexual harassment was also a major stressor that exacerbated the ongoing stress: "I think that majorly exacerbating it was the situation at work, along with the stressors that went with it."

B.

The facts about Sheriff Barker's response to Blakely's harassment are primarily relevant to the Sheriff's appeal of the decision denying his motion for summary judgment on qualified immunity. Accordingly, we draw on the summary judgment record for the following discussion, and we construe the facts in the light most favorable to Carter, the nonmovant. Carter first told Sheriff Barker about Blakely's harassment on June 16, 1995. Barker states that he had no doubt that Carter told the truth. Barker told her that he would take care of the matter. Nevertheless, Sheriff Barker did not officially warn, reprimand, discipline, or even investigate Blakely. Instead, Barker held a meeting with the Narcotics Unit the next day, June 17, 1995, and gave a general warning about sexual harassment. Blakely was at the meeting, and Barker allowed Blakely himself to speak out against sexual harassment. At the meeting Barker stated that allegations had been made regarding sexual harassment, that these situations were over, and that everyone was to go on with their regular business. Carter expected Sheriff Barker to take further action. Barker, however, kept insisting that Carter needed to confront Blakely face-to-face.

After Blakely's final sexual assault in August 1995, Carter immediately told her husband and Barker about it. Carter also confronted Blakely on the telephone. She later told Barker that Blakely had admitted that he was wrong and had apologized. Barker encouraged her to call Blakely again and have her supervisor, Steven Porter, tape the conversation. This plan fell through.

In early September 1995 Blakely's son was forced to resign from the Sheriff's Department for sexually harassing another employee.

8

When Carter pressed Barker for action against Blakely, Barker put her off by saying that he needed to allow some time to pass because it would not look good if he acted so soon after firing Blakely's son. In December 1995 Barker gave Blakely an excellent rating and a pay increase. Soon thereafter Blakely found out that Carter had told Porter about the harassment. Blakely then went to Barker and demanded a face-to-face meeting with Carter. Barker and Porter discussed the possibility of such a meeting, and Barker said he agreed that Carter was not emotionally or physically capable of withstanding such a confrontation. Nevertheless, Barker arranged a meeting between Blakely and Carter for January 2, 1996, and promised her that he and Major Albert Dillon would be there to protect her. Barker refused to allow either Carter's attorney or Porter to attend the meeting.

At the meeting Carter was given a chance to set out her allegations of sexual abuse and harassment. Blakely became angry and began shouting and calling Carter a "liar" and a "sick human being." Neither Barker nor Dillon intervened to stop Blakely or to protect Carter. The next day Barker told Carter that Blakely was willing to retire if it would end things, but Carter told him that this was not acceptable. Then, on January 4, 1996, Blakely tearfully confessed to Barker, Dillon, and Carter that everything Carter said was true. He also stated that he was sorry, that he hoped he and Carter could be friends again, and that he would have made love to Carter if she had let him.

Even though Blakely confessed, Barker did not discipline Blakely. Barker had ordered an internal investigation, but Blakely accepted early retirement before the investigation was concluded. Barker pressured Carter not to file a lawsuit and to keep quiet, telling her that asking for money damages was extortion, that he was worried that the scandal would put him out of office, and that she should settle with Blakely. In March 1996 Blakely tape recorded the statements of another woman who made allegations concerning Carter's involvement with other men. Blakely took the tape to Barker. Since that time Blakely has denied that he harassed or assaulted Carter. He claims that his confession was simply a lie to get the matter to end.

C.

After filing her EEOC charge on April 3, 1996, Carter instituted this lawsuit on September 22, 1997. Carter sued Chief Deputy

9

Blakely, Sheriff Barker, and Forsyth County, alleging a Title VII claim for sexual discrimination and retaliation, a § 1983 equal protection violation, and various state law claims. Carter also sued Hartford Fire Insurance Company, the surety on Sheriff Barker's bond, for bond violation under North Carolina law. Sheriff Barker filed a motion to dismiss all official capacity claims against him, claiming that they were barred by Eleventh Amendment immunity. Chief Deputy Blakely filed a motion for summary judgment on Carter's Title VII, § 1983, North Carolina equal protection, and North Carolina constructive discharge claims. Sheriff Barker, Forsyth County, and Hartford Fire Insurance Company then each separately moved for summary judgment on all of the claims against them.

On December 3, 1998, the magistrate judge issued a recommendation and order on the dispositive motions. As to Sheriff Barker, the magistrate judge recommended that the sheriff's motion to dismiss under the Eleventh Amendment be denied. He also recommended denying summary judgment to Barker on (1) the Title VII official capacity claim, (2) the state law intentional infliction of emotional distress, assault, and battery claims, and (3) the official and individual capacity claims under § 1983. The magistrate judge specifically rejected Barker's claim of qualified immunity on the individual capacity § 1983 claim. To the extent that Carter asserted an individual capacity Title VII claim against Barker, the magistrate judge recommended that it be dismissed. The magistrate judge also recommended granting summary judgment to Barker on the North Carolina (1) equal protection claim, (2) constructive discharge claim, and (3) individual capacity claims for negligent infliction of emotional distress, and negligent hiring and retention of Blakely. The official capacity claims for negligence remained. As to Blakely's motion, the magistrate judge recommended granting summary judgment to him on the (1) Title VII claim, (2) the North Carolina equal protection claim, and (3) the North Carolina constructive discharge claim. The magistrate judge recommended denying Blakely's motion on the § 1983 claim. The magistrate judge recommended granting summary judgment to Forsyth County on all claims, except for the Title VII claim. Finally, Hartford Fire Insurance Company had moved for summary judgment on the same grounds as Sheriff Barker, and the magistrate judge recommended denying Hartford's motion because Sheriff Barker was not entitled to summary judgment on all claims.

10

On the eve of trial on February 1, 1999, the district court announced that it was adopting the recommendations of the magistrate judge. That same day Sheriff Barker filed an immediate notice of appeal of the decisions denying him Eleventh Amendment and qualified immunity, but he did not "appeal the denial of the motion to dismiss the Title VII claim asserted against him in his official capacity." Consequently, the official capacity Title VII claim against Barker went to trial as did the Title VII claim against Forsyth County. The parties also went to trial on the following claims against Blakely: the § 1983 claim as well as the state law claims for intentional infliction of emotional distress, negligent infliction of emotional distress, assault, and battery. Finally, the parties agreed that if the sheriff was potentially liable, then Hartford Fire Insurance Company was a proper defendant. However, they also agreed that Hartford would not be mentioned at trial.

At the close of Carter's evidence, the defendants moved for judgment as a matter of law. The district court granted the motion to dismiss Forsyth County, principally relying upon the finding that "the Sheriff is the employer of Mrs. Carter and not the County." At the close of all of the evidence, Sheriff Barker again asserted his right to an immediate appeal on the immunity issues, and the district court recognized the sheriff's right to take the appeal. However, Sheriff Barker did not appeal on the Title VII claim. The court granted judgment as a matter of law in favor of Barker and Hartford Fire Insurance Company on that claim. As a result, none of the claims against Barker were submitted to the jury.

During the charge conference, the parties agreed to consolidate Carter's claims against Blakely, and the jury only considered her § 1983, assault, and battery claims. Carter also stipulated that her only claim of damage was based on her alleged emotional distress. The jury returned a verdict against Blakely for $60,000 in compensatory damages and $200,000 in punitive damages. Chief Deputy Blakely filed a motion for a new trial or remittitur of damages. The district court denied Blakely's motion and entered final judgment in favor of Carter on September 1, 1999. This appeal and cross-appeal followed.

II.

Sheriff Barker and Chief Deputy Blakely challenge the district court's decision on a number of grounds. We take each of their arguments in turn.

11

A.

Sheriff Barker argues that the district court erred by denying him Eleventh Amendment immunity. Because the Eleventh Amendment does not protect local government entities and officials, our analysis turns on whether Sheriff Barker is a state or a local official. See Gray v. Laws, 51 F.3d 426, 430-31 (4th Cir. 1995). The sheriff concedes that we held in Harter v. Vernon, 101 F.3d 334 (4th Cir. 1996), that a North Carolina sheriff sued in his official capacity was not entitled to Eleventh Amendment immunity. The sheriff argues that two recent Supreme Court decisions, Regents of the University of California v. Doe, 519 U.S. 425 (1997), and McMillian v. Monroe County, 520 U.S. 781 (1997), have changed the law on Eleventh Amendment immunity for government officials. We disagree. In Regents of the University of California, the Court held that the fact that a third party (the federal government) had agreed to indemnify a state instrumentality did not divest that state agency of Eleventh Amendment immunity. See Regents of the Univ. of Cal., 519 U.S. at 431. Because Carter's case does not involve reimbursement, the Regents decision does not apply. The McMillian decision is also inapplicable because it did not address Eleventh Amendment immunity, but rather whether an Alabama sheriff's actions constituted county policy under § 1983. See McMillian, 520 U.S. at 783. Turning to our analysis of Carter's case, we have considered all the factors our cases list as relevant to determining Eleventh Amendment immunity. For example, the state treasury and state sovereignty are not implicated in this suit, and the state does not control the Sheriff's personnel decisions. We therefore conclude that the Eleventh Amendment does not bar Carter's official capacity suits against Sheriff Barker. See Hess v. Port Auth. Trans-Hudson Corp., 513 U.S. 30, 39-51; Harter v. Vernon, 101 F.3d 334, 340-43 (4th Cir. 1996); Gray, 51 F.3d at 431-34. Accordingly, we affirm the district court's decision denying Barker Eleventh Amendment immunity and remand for trial on Carter's official capacity claims under § 1983 and state law. We note here that we affirm the district court's directed verdict in favor of Barker on Carter's Title VII official capacity claim on a separate ground discussed later in part III.A.

B.

Barker next contends that the district court erred by not granting him summary judgment based on qualified immunity on Carter's indi-

vidual capacity § 1983 claim. In order to prove that an officer lacks qualified immunity, a plaintiff must show, inter alia, that "a reasonable person in [the officer's] position would have known that his actions were unlawful." Shaw v. Stroud, 13 F.3d 791, 801 (4th Cir. 1994). And, to establish supervisory liability, a plaintiff must show, inter alia, that a "supervisor's response . .. was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices." Id. at 799 (internal quotation marks omitted). Barker argues that he was entitled to qualified immunity because a reasonable officer in his position would not have known that his actions were deliberately indifferent.

We disagree. Based on the summary judgment record, the magistrate judge concluded that Carter produced evidence from which a jury could find that (1) "Barker was aware of and believed plaintiff's allegations of harassment in June of 1995," (2) "Barker took no action other than to hold a meeting on sexual harassment at which he allowed the alleged harasser to speak," (3) "plaintiff was assaulted again in August [1995] and informed Barker of this," (4) "Barker responded [that he would] arrang[e] a taping session which fell through," and (5) "Barker took no further action until he held a meeting where he allowed Blakely to harass and intimidate plaintiff." Assuming these facts are true as we must at the summary judgment stage, we conclude that a reasonable person in Barker's position would have known that his actions were deliberately indifferent and therefore unlawful. Accordingly, the district court was correct to adopt the magistrate judge's analysis and to deny Sheriff Barker summary judgment on qualified immunity grounds. We therefore remand for trial on Carter's § 1983 claim against Barker in his individual capacity.

C.

Blakely argues that the district court should have granted his motion for a new trial on the ground that Carter failed to prove that the alleged harassment proximately caused her emotional distress. We review a district court's denial of a motion for a new trial for abuse of discretion. See Rice v. Community Health Ass'n, 203 F.3d 283, 287 (4th Cir. 2000). Causation was an element of Carter's § 1983 claim as well as her state-law tort claims. See Price v. City of Charlotte, 93

13

F.3d 1241, 1250 (4th Cir. 1996); Gillikin v. Burbage, 139 S.E.2d 753, 759 (N.C. 1965). To be sufficient, causation evidence must show "a probability and not a mere possibility that the alleged tortious conduct caused the alleged injury." Harrison v. Edison Bros. Apparel Stores, Inc., 151 F.3d 176, 179 (4th Cir. 1998) (internal quotation marks and alteration omitted). We agree with the district court that Carter provided sufficient evidence of causation.

Blakely argues that Carter's case is analogous to Harrison v. Edison Bros. Apparel Stores, Inc. in which we held that the plaintiff had not shown causation. However, we conclude that Carter's case presents a very different situation. The plaintiff's sole remaining claim in Harrison was for negligent retention of the harassing employee for a period of only seven days, and she presented no direct evidence to link her emotional distress to events in those seven days. See id. at 179-80. While Carter admittedly suffered "a universe of emotional distress [caused] by several significant stressors," she did provide direct evidence linking the sexual harassment to her emotional distress. She testified that Blakely's harassment made her feel ashamed and that she frequently vomited after his assaults. Several witnesses testified that Carter cried, sometimes hysterically, because of the harassment. Dr. Valla also testified that the sexual harassment increased Carter's already chronic pain and caused her to suffer emotional distress. Carter has thus provided sufficient direct evidence of causation, and we affirm the district court's decision on this issue.

D.

Blakely argues that the district court erred when it rejected his Rule 50 motion made at the close of Carter's evidence. Specifically, he argues that Dr. Valla's testimony on causation should have been struck as being based on speculation and conjecture. We review a district court's decision to admit expert testimony for an abuse of discretion. See Tyger Constr. Co. v. Pensacola Constr. Co., 29 F.3d 137, 142 (4th Cir. 1995). "An expert's opinion should be excluded when it is based on assumptions which are speculative and are not supported by the record." Id. It is true that Dr. Valla admitted that Carter suffered from at least 36 stressors and that Dr. Valla could not quantify the exact extent of any one stressor's contribution to Carter's emotional distress. However, such strict quantification of psychologi-

14

cal injuries is unnecessary. <u>See Merriweather v. Family Dollar Stores, Inc.</u>, 103 F.3d 576, 581 (7th Cir. 1996). Dr. Valla testified that Blakely's sexual harassment specifically caused Carter emotional distress and "majorly exacerbat[ed]" her overall condition. This testimony is sufficient because it was not grounded in speculation and conjecture as Blakely contends; rather, it was based on particular facts and knowledge gained through Dr. Valla's treatment of Carter. We therefore conclude that the district court was well within its discretion in admitting Dr. Valla's expert testimony on causation.

E.

Blakely next argues that the district court erred when it denied his motion for a new trial or remittitur of the $60,000 compensatory damages award. Blakely argues that the compensatory damages award was invalid because it was against the clear weight of the evidence. <u>See Cline v. Wal-Mart Stores, Inc.</u>, 144 F.3d 294, 305 (4th Cir. 1998) (recognizing that a damages award "must be set aside if . . . the verdict is against the clear weight of the evidence") (internal quotation marks omitted). In <u>Cline v. Wal-Mart Stores</u> we reduced a damages award from $117,500 to $10,000 on this ground. In that case we described the plaintiff's evidence as follows:

> Although the testimony suggests that Cline suffered some degree of emotional trauma and anxiety as a result of his demotion, there is no evidence that such trauma persisted over time; that it affected Cline's ability to perform his job or to cope with his medical condition; that Cline required counseling or medication of any sort; or that Cline suffered physical symptoms of stress, such as depression or loss of sleep.

<u>Id.</u> at 305-06. As compared to the plaintiff in <u>Cline</u>, however, Carter has presented much stronger evidence of her emotional trauma and anxiety. The district court here described Carter's evidence succinctly:

> The testimony suggests that Carter suffered a high degree of emotional trauma and anxiety as a result of Blakely's conduct. Carter suffered physical symptoms of stress such as

15

nausea, vomiting, nightmares, loss of sleep, and decreased appetite. The harassment and sexual assaults increased Carter's pre-existing pain and were a consistent theme throughout Carter's counseling sessions with Dr. Valla, who prescribed a variety of medications to treat anxiety, depression, pain, and loss of sleep.

Based on this evidence, we conclude that the district court was within its discretion in sustaining the award of $60,000 in compensatory damages against Blakely.

F.

Blakely also argues that the district court erred by denying his motion for a new trial or remittitur with respect to the $200,000 punitive damages award. Blakely argues that the punitive damages award was grossly excessive and resulted in a miscarriage of justice. On a party's motion for new trial, the court may set aside a verdict and grant a new trial if the jury's punitive damage award will result in a miscarriage of justice. See Atlas Food Sys. and Servs., Inc. v. Crane Nat'l Vendors, Inc., 99 F.3d 587, 594 (4th Cir. 1996). Where the punitive damages award is grossly excessive, it may also violate the due process clause. See BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). The Supreme Court has established three factors for determining if a punitive damages award is grossly excessive: (1) the degree of reprehensibility of the defendant's conduct, (2) the disparity between the harm or potential harm suffered by the plaintiff and the punitive damages award, and (3) the difference between the award and the civil or criminal penalties authorized or imposed in comparable cases. See id. at 574-85. The first factor of reprehensibility is perhaps the most important. See id. at 575. The district court found that Blakely's conduct was particularly reprehensible and constituted an abuse of power. While serving as second in command of the Sheriff's Department, Blakely physically harassed Carter from 1992 to 1995, and the severity of the assaults increased over time. In addition, the punitive damages award was within an acceptable range as it was between 3 and 4 times the amount of the compensatory damages award. Criminal penalties were also potentially available for Blakely's conduct. See, e.g., N.C. Gen. Stat. § 14-33. Based on the evidence in this case, we conclude that the punitive damages award was neither

16

grossly excessive nor resulted in a miscarriage of justice. The district court was within its discretion in denying Blakely's motion for new trial on the punitive damages award.

G.

Blakely finally challenges some of the district court's evidentiary rulings. We review a "district court's decision to admit or exclude evidence under an abuse of discretion standard." <u>United States v. Hassouneh</u>, 199 F.3d 175, 182 (4th Cir. 2000).

1.

Blakely argues that the district court erroneously admitted evidence regarding Blakely's alleged prior misconduct. According to Blakely, this evidence "included testimony regarding Barker's knowledge of past allegations of sexual harassment against Blakely; Barker's actions based on knowledge of past allegations against Blakely; newspaper articles regarding past allegations against Blakely; Barker's reaction to the allegations in the instant case; and Barker's communications to plaintiff, her husband, and other third parties regarding past allegations against Blakely." Brief of Appellants at 51. Blakely concedes that the trial court admitted the evidence "solely for the purpose of showing Barker's knowledge of Blakely's misconduct, as plaintiff was required to establish her claims against her employer." Brief of Appellants at 55. Blakely argues, however, that the case should not have proceeded to trial against Barker because on the eve of trial Barker gave notice of immediate appeal on Eleventh Amendment and qualified immunity grounds. Consequently, Blakely argues that this evidence was really about his character and was inadmissible under Federal Rules of Evidence 404(b).

Carter responds that this evidence was relevant to her Title VII official capacity claim against Sheriff Barker. Because Barker never appealed this claim, it went to trial and was not decided until the district court directed a verdict in Barker's favor at the close of all the evidence. When analyzing an employer's liability, the Supreme Court has developed the following test:

17

> An employer is subject to vicarious liability to a victimized
> employee for an actionable hostile environment created by
> a supervisor with immediate (or successively higher) author-
> ity over the employee. When no tangible employment action
> is taken, a defending employer may raise an affirmative
> defense to liability or damages, subject to proof by a pre-
> ponderance of the evidence. The defense comprises two
> necessary elements: (a) that the employer exercised reason-
> able care to prevent and correct promptly any sexually
> harassing behavior, and (b) that the plaintiff employee
> unreasonably failed to take advantage of any preventive or
> corrective opportunities provided by the employer or to
> avoid harm otherwise.

Smith v. First Union Nat'l Bank, 202 F.3d 234, 244 (4th Cir. 2000)
(quoting Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998),
and Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765 (1998)). The
challenged evidence was relevant to the elements of the affirmative
defense. We also note that the district court took steps to limit any
prejudice to Blakely. The court offered Blakely the opportunity to
make a motion for a severance. Blakely, however, said he was "con-
tent to stay and asked for a limiting instruction." Thus, in accordance
with Federal Rules of Evidence 105, the court instructed the jury that
the evidence of Blakely's other misconduct could be considered only
against the Sheriff and the County. See Fed. R. Evid. 105 ("When evi-
dence which is admissible as to one party or for one purpose but not
admissible as to another party or for another purpose is admitted, the
court, upon request, shall restrict the evidence to its proper scope and
instruct the jury accordingly." ). We therefore conclude that the dis-
trict court did not abuse its discretion in admitting this evidence.

2.

Blakely also argues that the district court erroneously excluded cer-
tain evidence that could have shown that Carter welcomed Blakely's
conduct. According to Blakely, this evidence included Carter's "state-
ments to third parties about her sexual relationships with Sheriff's
Office employees; [Carter's] sexual relationships with Sheriff's
Office employees; [Carter's] statements that she was attracted to
some Sheriff's Office deputies; [Carter's] statements that several dep-

18

uties were pursuing her romantically; [Carter's] statements that a Kernersville police investigation of her husband was causing her tremendous stress; and a tape recording of a witness discussing [Carter's] sexual relationships with members of the Sheriff's Office." Brief of Appellants at 57. Although the district court did not always explain its rationale for excluding this evidence, several grounds for exclusion applied. The court could have excluded it under Rule 404(b) as character evidence not admissible to prove conduct, under Rule 401 as irrelevant evidence, and under Rule 403 as prejudicial evidence. Moreover, it appears that the district court carefully considered each item of this evidence because it did admit some evidence of Carter's other relationships. Accordingly, we conclude that to the extent the district court excluded evidence that Blakely offered to show that his conduct was welcomed, the court was within its discretion.

III.

In her cross-appeal Carter argues that the district court erred in dismissing Carter's Title VII claims against Sheriff Barker and Forsyth County.

A.

With respect to Sheriff Barker, the district court concluded that Carter did not file her charge of discrimination with the EEOC on a timely basis. Carter was required to file her EEOC charge within 180 days of the discrimination. See 42 U.S.C. § 2000e-5(e). Carter argues that she made a timely filing under the continuing violation theory. Incidents do not amount to a continuing violation unless there is an incident of harassment within the 180-day window that can be linked to other incidents "as a series of separate but related acts amounting to a continuing violation." Beall v. Abbott Labs., 130 F.3d 614, 620 (4th Cir. 1997) (internal quotation marks omitted). The district court concluded that Carter did not offer sufficient evidence to support a finding of timely filing under the continuing violation theory, see Brief of Appellee/Cross-Appellant at 51, and we affirm on that reasoning. In the alternative, Carter argues that the 180-day period should be equitably tolled. The doctrine of equitable tolling "focuses on the plaintiff's excusable ignorance of the employer's discrimina-

19

tory act." Felty v. Graves-Humphreys Co., 785 F.2d 516, 519 (4th Cir. 1986). Because Carter does not claim ignorance of Blakely's acts, she cannot benefit from the tolling doctrine. Nor does the doctrine of equitable estoppel apply. Equitable estoppel covers situations where an employer uses coercive practices or has a deliberate design to get the employee to delay filing. See id. at 520. Although Barker asked Carter not to file charges, the district court found that Barker's statements took the form of requests and not threats. The district court therefore correctly directed a verdict in favor of Barker on Carter's Title VII claim.

B.

Carter also argues that it was error for the district court to dismiss the Title VII claim against Forsyth County. The district court reasoned that the County was not Carter's employer. Because we have determined that Carter's Title VII claim was untimely, however, we need not reach the question of whether the County acted as her employer. We therefore affirm the dismissal of the Title VII claim against the County on the ground of untimeliness.

IV.

For the foregoing reasons, we affirm the challenged decisions of the district court. We affirm the judgment against Blakely for $60,000 in compensatory damages and $200,000 in punitive damages. We remand for trial on Carter's § 1983 and state law official capacity claims against Barker as well as on her § 1983 individual capacity claim against Barker.*

AFFIRMED AND REMANDED
_____

* Prior to trial the parties agreed that as the surety on Sheriff Barker's bond, Hartford Fire Insurance Company could only be liable if the Sheriff was liable. Because we remand several claims against the Sheriff, we also remand Carter's claim against Hartford for further consideration by the district court.

20